Dempsey, whenever you're ready. Good morning, Your Honors. I represent Petitioner in these meetings. I want to start with a quote from Founding Father Madison in the Federalist Papers No. 48. This is in 1788. 237 years ago he noted, it will not be denied that power is of an encroaching nature and that it ought to be effectually restrained from passing the limits assigned to it. What is he talking about? Separation of powers. There is a raging battle over the authority of the courts to declare what the law is. And in Loper Bright, the Supreme Court made it clear that the duty and province to declare what the law is belongs to the courts and only the courts. And in so doing, it effectively gave us some homework as multiple circuit courts across the land are looking at terms of art in the Immigration and Nationality Act and determining as a matter of law, which is the court's expertise, what those terms mean. The term at issue in this case is particular social group. That is a classification that can ground a claim for asylum as this court often deals with petitions for review. I need not say more. The Sixth Circuit, what I have asked, what Petitioner has asked the court to do is take a fresh look at the term particular social group and determine how it and its expertise to read the law, what it says, what it means. And here's, I understand the broad legal challenge to the BIA definition of particular social group under Loper Bright. I understand that. But Loper Bright also said that it wasn't disturbing, it wasn't disturbing the stare decisis effect of cases decided before it, right? We've, we in the past before Loper Bright had deferred to the BIA's interpretation of that statutory phrase, right? That's correct. So you have to give us a reason to overcome stare decisis in this case. And let me tell you what my particular concern is. And you can take the to address it if you would like. I'm not sure that the definition you've provided is one that we should adopt or is helpful. You gave us two, I think you gave us two possible definitions of the term. This is what I take from your brief. Definition one, some characteristics setting the group off in a definitive way from the vast majority of society. And in the supplemental brief you say, two or more describable distinctive or distinguishable, or distinguishable characteristics of members sharing common characteristics that can be considered in the aggregate. Wow. I just, I just don't know what content that means. I've anticipated your question. If you have, if you have, if you have people who wear red all the time, right? And wear a certain type of shoe all the time. They do it all the time because they want to set themselves off from the rest of society. That meets your second definition. Correct. And, and that, that would be a, that would be a particular social group under the Immigration and Nationality Act for asylum purposes? Yes. And if people want to kill you because you want to express your views, affiliations, relationship to a group by wearing red shoes, we want, we will give you safety here in the United States. That is what the whole concept of asylum is about. Yeah. It followed the counsel. Go ahead and go ahead. I just have a follow up question. Um, there's another case that we have called Perez Centeno that I believe Judge Marcus wrote, where he went through two different, um, analysis. And one of them was assuming Chevron deference. But the second alternative holding was assuming no Chevron deference. We have precedent that discuss what a particular social group, what the definition of that is. And is this group cognizable? And one of the factors was, is there an, is, example, someone wearing red shoes, that's not an immutable characteristic. So therefore, it would not be a cognizable social group. Can you address that factor? Because obviously a business owner, you could sell the business and you're no longer a business owner. Excellent question, Your Honor. Um, immutable is the, there's current, this court, um, deferred to the BIA and adopted its definition of particular social group. Um, first point, because this court. But there was an alternative holding where the court went through, uh, a specific analysis of what was, uh, a particular social group. Correct. But, so the stare decisis issue, we, there will not be upending of cases prior to this one. But we are here today and per the guidance of Loper Bright, we have to decide the case based on the Supreme Court's instructions that we, the court, um, look at the terms. So immutable is where my definition differs from the prior definition and the deferred definition by the BIA. Immutable makes the definition of particular social group unduly restrictive. Nowhere in the INA is it said anywhere that we're, we're about keeping people out of the United States. It is about following rules. It is about the law is meeting standards so we could determine if they are entitled to be here based on what the legislature has dictated. Immutable is unduly restrictive. Um, it requires a common characteristic fundamental to their conscious or identity or a shared past experience. My definition is admittedly broader but not unwieldy, um, or unmanageably broader. It merely requires on the two remaining elements, which is social distinction and particularity. Although my particularity read is that it just needs to be perceived as a group by society in general. Putting red shoe analogies, um, our hypotheticals aside, let's take shepherds. A shepherd is not expressing a political opinion, sexual preference, um, any of the other varieties, uh, but if a society in a certain country decided they want to do target practice on shepherds and started killing them and that was okay, under my definition they would be entitled to come to the United States because we want law-abiding people to come, to, to be able to come here and be safe. That has been what the United States has been about since the very beginning. My family wouldn't even be here if it wasn't for that welcoming. You just, so you just need one distinguishing trait and, and that's it no matter what the trait is and no matter what its ties to if the other categories that normally trigger asylum protection? It, it needs to be weighty but, um, in this case for instance, let's, let's talk about this case. We didn't just, this court has repeatedly held that small business owners are not a particular social group because it's too amorphous, it's, it's undefinable. In this case we have the added layer that she has claimed asylum protection on her perception of wealth. Now we're getting somewhere. You know this whole eat the rich, um, so in, in the Honduras anybody with perceived wealth like the people on River Oaks Road in San Marco will be targeted because of their wealth and because of that we should allow them under the Immigration and Nationality Act as it reads today to come to the United States and be safe and be wealthy here. Um, so it's not just, it's, it's not so unmanageably broad but, but... What level of wealth do we use? I think it's subjective to the case. I mean that's where we... No, but you need, you need a general standard of applicability. It just can't be ad hoc, I don't think, on a case-by-case basis. The nexus... If you have somebody that you believe is relatively wealthy as a business owner, another person might think that that is not really all that wealthy. You may have somebody who makes, to use hypothetical numbers, somebody who makes, you know, a hundred thousand dollars a year from his or her business, to some that might be incredibly wealthy, to others it might be a drop in the bucket depending on what other subjective perspective they have on wealth. So what, what, what standard do we use for wealth on the wealth part of business owner in your definition? The standard is, are they being targeted by their membership in the group of the wealthy or their perception of the wealthy? Are they being threatened harm or death because of their wealth? And that's what's happening with this petitioner. That's why she fled. They wouldn't have cut the head off her dog and threatened to do the same thing to her son if she wasn't wealthy. What would be the point of that? That would just be general harassment and not a basis for an asylum claim. But because she owns a coffee company with 25 employees, nice house, they perceive her as wealthy and they're, you know, eat the rich. I think the six... I really want to spend just a quick moment to talk about what the Sixth Circuit did recently post-Loper-Brighton. That's what I think the court should do here. In the case I'm talking about, it came after our supplemental briefing. It's Moctezuma-Reyes v. Garland. It's at 124F4-416 and at page 421 is the central holding. This case was decided December 23rd, 2024. And they were dealing with the definition of exceptionally and extremely unusual hardship in the context of cancellation or removal. They said because their prior decisions deferred to the BIA, they had to do a fresh look. And that's what they did. And they did exactly what I did in my brief. And they went to Webster's Dictionary, Black's Law Dictionary and defined the terms and declared as the authority on what the law says that the exceptional and extremely unusual hardship means hardship sustained by deported aliens qualifying relatives that's significantly different or greater than the hardship normally experienced by a family when a member is deported. So something extra, some extra reason. By getting rid of immutability, which we should never define a phrase with a term somebody has to look up, we're not opening the doors wide open. There still needs to be a demonstrable showing subjective to the circumstances of the case that they are perceived by a group, by society in general. They are susceptible of a label. I'm out of time. I have three minutes on rebuttal. Yes, Your Honor. You've kept them all. Thank you very much, Mr. Dempsey. Mr. Verby. Good morning. May it please the Court. Russell Verby, on behalf of Attorney General Bondi. The petitioner asked this court to simply just jump into the deep end of the pool and come up with a completely new definition for the statutory phrase particular social group. And while the court does possess that inherent authority, the Loper-Bright decision asked this court to make a couple of stops along the way and consider a few things before doing that. The first, obviously, is stare decisis. Loper-Bright is perspective. It will not unseat precedent unless there is special justification for doing so. An earlier court's reliance on the now-defunct Chevron deference paradigm is not special justification. Forty years ago, the board established immutability in matter of a cost as a requirement for a particular social group. For nearly 20 years, starting with Castillo-Arias, this court has agreed with that decision. When the board refined its decision in 2014 and said that a social group is immutable, has defined with particularity, and socially distinct within society, this court agreed with that in 2016 in Gonzalez. So that decision also is closing in now on 10 years of precedent. So all of the cases that those two decisions have influenced still stand as good law. And as Judge Lagoa pointed out, to put a better, finer point on this, this court in Perez and Tino said regardless of whether it followed Chevron or actually looked at the statute with fresh eyes, it would reach the same conclusion that immutability still applies. I mean, why do you think, let's talk about, for purposes of my discussion with you now, put stare decisis off for a second. Yes, sir. Even though I know, as you said, it is an important stopping point along the loop or bright line. Immutability isn't a characteristic of all of the other protected categories for asylum, right? Well, I think both the board and this court have raised it a little differently. They have said that immutability is inherent in all of the protected grounds under the asylum withholding statute. That's not right, though. Well, if you look at a person's race, they can't change it. If you look at a person's race. I said all of them. Religion. Well, if you look at nationality. Religion. Religion, you shouldn't have to change. It's a matter of conscience. People change it. They do change. As a matter of conscience, with or without persecution. But you shouldn't have to. So it's taken on an immutable-like characteristic. And the same goes for a person's political opinions. We don't require people to change their political opinions. It has a matter of conscience and an immutable-like sort of connotation. Immutable means you can't change them. Those things are changeable. You can decide to change your religion and your religious beliefs. And you can decide to change your political beliefs or political affiliations. My only point is that immutability is not a shared characteristic of all of the other protected categories for asylum. And if that's the case, why should immutability carry over to a particular social group, which is also a protected category? On a fresh look basis. On a fresh look, I mean, I will just pause to point out that said in Castillo-Arias, this court said immutable or fundamental to a member's individual conscience or identity. So that's... That can't be right. Then that's not immutability. Because immutability is something... The definition of immutable is something that you cannot change. I completely agree, Your Honor. Right. And so if that's what we're saying immutability means, it's not really immutability. It's something else. Well, I think the language I just given you, which most of the courts hold to, is it's immutable or fundamental to a person's conscience and they shouldn't have to change it. So if we go back to your red shoe thing, a red shoe decision is not fundamental to a person's conscience. They shouldn't have to change it. A person's religion can be. They can choose to change it. I've changed mine at one point in my life. But I shouldn't have to change it to avoid harm. And that's where the distinction comes in.  That's a really, really fine line. And they sort of have to be fine lines because if we don't have immutability or something very akin to immutability because of a person's conscience, they shouldn't have to change it to avoid harm. Then what we do create, this is a simple catch-all that a person can jump into. I agree with that. I agree with that problem. And I talked to Mr. Dempsey about it. But give me an example of a particular social group with an immutable characteristic that would be recognized. That would be recognized? An immutable characteristic? A person's clan, a person's tribe. A person's what? A person's clan that they're born into. They can't change that. What does that mean, a clan? Let's say if I was born in the Congo and my clan forms actually a particular tribe, which happens there a lot, there can be war between clans and tribes based on anything imaginable, as is going on in the Eastern Congo now over riches. But it's also based on clan and tribe. And so those are immutable characteristics that you can't change by virtue of your birth. And if you're being persecuted simply because you belong to this particular clan or tribe, that's your particular social group that is deserving of protection. I would assume, also, you could be born into a caste. I'm sorry, Judge Legault, I didn't come through clearly. If you were born into a caste in India. Exactly right. If you were born into the untouchable caste in India and often are subject to abuse, which happens there, that could be a particular social group, certainly. I know, Judge, if we wanted to move away from just stare decisis alone, we also get to the notion that was put out in Loper-Bright that the court should continue to use all its tools in its toolkit with respect to statutory interpretation. And one of those is looking to some guidance and inspiration from the Board of Immigration Appeals. And as I reviewed a few moments ago, we have 40 years of precedent from the Board of Immigration Appeals on this issue. And the courts have accepted all of that over the past 40 years. So the court can look and continue to look for some inspiration there without abdicating from its critical judicial function of statutory interpretation. I mean, how do you think you do that legally? Do you sort of give it like, I don't want to mix standards. We're all living in a different world of judicial review right now. Would it be some sort of like a soft deference a la our, or seminal rock, or something like that? Or would it just be another source that you look at and say, I look at it intrinsically, holistically, and I'm persuaded by it? I think the last word I would ever speak in front of a court these days is deference, Your Honor. So I'm going to avoid saying that. I think it's more something akin to Skidmore, and just a recognition that the agency has some more expertise in this area. I'm just going to look at what they said, and I'm going to put that as inspiration, not guidance, or deference, or anything into my total equation as a statutory interpreting judge. And just add it, as the Chief Justice said, it's just another tool in the toolkit, Your Honor. And I think it's definitely more of a Skidmore type situation. Can you speak in the time you have left to the proposed definitions that Mr. Dempsey has put forth? Well, I think the proposed definitions are problematic because, and it goes to what you were getting on, is how intrinsic or how deep does this shared characteristic have to go? Let's say it's two people who live in a particularly dangerous apartment building in a particularly dangerous city somewhere in the world, and they're harmed by gangs. They meet this definition, but all it is is that they've been harmed by gangs and just happen to live in the same apartment building. No, not quite under his definition, because I think he says that they would be targeted because of those shared characteristics, not just because they happen to be there. And I was just about to get to that, that if you're, he's almost bordering on defining the particular social group by the fact that it was harmed, which is the circular group that the court has, that this court and other courts and the board has warned against over and over and over again. It becomes circular because it's the harm that actually defines the membership in the group as opposed to the actual characteristics that define membership in the group. Have, have any, to your knowledge, have any appellate courts taken on this fresh review of particular social group after Loper Bright? Not particular social group yet, Your Honor. There was in the, I believe in the Fourth Circuit, recently had a decision, and I didn't because it dealt with the unwilling and unable aspect of the asylum claim, but it didn't reach into particular social group. So if there are no further questions, the Attorney General will simply ask that the board's decision in this matter be upheld. All right. Thank you very much, Mr. Verby. Your Honor, I'd like to pick up where you just left off and survey what's happened in the other circuits with the new Loper Bright fresh look, cut from a fresh cloth, as the Sixth Circuit said. Look at statutory terms and definition. We've already discussed the Sixth Circuit case. It did exactly what I proposed. Look at the text. Define terms according to their plain meaning. Immutables over the top. But don't, you know, petitioners not asking the court to open the door wide open. There has to be some label, some aspect that it is a person that is a member of a classification or label that is being targeted with violence. And under that circumstance, we welcome you to come to the United States and be safe here. That's the whole point of asylum. The Eleventh Circuit. How do you, how do you, how do you, how do you address the argument or the analysis that the government just made about the circular group, which is that you're defining the particular social group by the harm? Well, they're, good question. It's come up before in other cases. There has to be a nexus with the harm, but the harm can't be the genesis of the group or the label that is being claimed. So the harm follows or the threats follow the existence of the label. That a person is of a certain classification or a member of a certain group in society. And because of that attribute, they're being targeted or harmed. In that circumstance, the United States Congress in 1952, following the wake of World War II and the refugee crisis said, come on, we'll take you. You could be safe here. Because that's what we stand for. Individual freedoms, liberties are our values. In the 11th, this court, late last year, almost got to the exact same question about particular social group. In Sequoia versus United States AG, 2024 U.S. Appellate Lexus 27288, but I quote, because the parties have not asked us to disturb prior BIA and 11th Circuit interpretations of the term PSG, we decline to do here. We have. So this court almost got close and we wouldn't even be having this argument today. But we're here now. The Ninth Circuit examined crime involving moral turpitude in Lopez versus Garland in May 17, 2024. They issued a decision at 116, fed forth 1032. Taking that fresh look that I have urged this court to make. But finding its prior reasoning persuasive, which this court could certainly do in this instance. The Fourth Circuit examined the unable unwilling requirement and found its prior reasoning persuasive in Molina Diaz at 2025 U.S. Appellate Lexus 3768. And material support is currently on the table for a definition in the Fourth Circuit right now pending a decision. I'm right on time, Your Honor. Thank you for your consideration in this case. No further rest on our briefs. All right. Thank you both very much. It's been helpful. All right. Our next.